RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0011p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

LESLIE FISHER,

    *Plaintiff-Appellant*,

    *v.*

RANDALL JORDAN, MATTHEW RICE, and JOHN
TRAFELET, Michigan State Police,

    *Defendants-Appellees*.

No. 23-1246

_____

Appeal from the United States District Court for the Eastern District of Michigan at Bay City.
No. 1:17-cv-12504—Thomas L. Ludington, District Judge.

Decided and Filed: January 18, 2024

Before: MOORE, READLER, and MURPHY, Circuit Judges.
_____

## COUNSEL
_____

**ON BRIEF:** James G. Gross, JAMES G. GROSS PLC, Detroit, Michigan, for Appellant. John Fedynsky, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees.

READLER, J., delivered the opinion of the court in which MURPHY, J., joined. MOORE, J. (pp. 11–16), delivered a separate dissenting opinion.
_____

## OPINION
_____

CHAD A. READLER, Circuit Judge. Leslie and Steven Fisher were arrested after officers executed a search warrant and discovered marijuana growing in the Fishers' garage. A state court eventually dismissed all charges against Leslie. She then sued the arresting officers in federal court, claiming that their decision to arrest her violated the federal constitution as well as

state law.  The district court granted summary judgment to the officers.  Because defendants had probable cause to arrest Leslie, we affirm.

**I.**

Steven and Leslie Fisher, husband and wife, resided in a single-family home they co-owned in Shepherd, Michigan.  The property included a detached garage located just a few steps from the house.  The Fishers also owned a workshop located down the street from their home.

Michigan state officers suspected that the Fishers' property was being used to grow and possibly sell marijuana.  A tipster told Officer Randall Jordan that Steven was growing marijuana at the Fishers' residence and processing the marijuana into THC wax at the Fishers' workshop.  The tipster claimed to have seen THC wax inside the shop, providing Jordan with what the officer believed to be an "extremely accurate" description of the wax.  Over the ensuing three weeks, officers discovered marijuana stems, wax paper, and what they suspected to be THC wax in trash from the Fishers' residence.

Suspecting illegal drug activity, Jordan obtained a warrant to search the Fishers' house, detached garage, and workshop.  Under Officer John Trafelet's command, a team of officers knocked on the Fishers' door and announced their presence.  When no one answered, Trafelet ordered forced entry, and the officers began their search.  They discovered 29.9 grams of marijuana in Leslie's bedroom, stored in a nightstand and a minifridge.  Elsewhere in the residence, officers found marijuana seeds, six firearms (two handguns and four long guns), body armor, jewelry, and nearly $4,000 in cash.  In the garage, officers found a trove of items signifying drug production:  over 25 pounds of marijuana, 67 marijuana plants, 5 drying racks, 12 growing lights, 10 growing "amps," a digital scale, and other paraphernalia used to grow and process marijuana.  And in the workshop down the street, officers discovered an additional six pounds of marijuana and THC wax and equipment used to cultivate the drug and convert it into wax.

As the search was underway, Jordan along with Officer Matthew Rice questioned the Fishers.  During those interviews, the couple presented the officers their Michigan Medical Marijuana Cards, meaning the Fishers, collectively, were authorized to possess 24 plants and five

ounces (approximately 142 grams) of marijuana. *See* Mich. Comp. Laws § 333.26424(a) (2016). Steven admitted that he began the grow operation two years earlier and that his efforts yielded several pounds of marijuana annually, which he stored in the garage. According to the officers, Steven explained that he had tried to sell his marijuana overages but could not find a buyer, a statement Steven later denied.

As for Leslie, she admitted to smoking marijuana grown by Steven. She also admitted that she knew Steven was growing marijuana in their garage. But she denied ever entering the garage during the two-year growing operation. She likewise claimed not to know how much marijuana Steven was growing, nor what he did "at his shop."

The officers had reason to doubt Leslie's story. The Fishers used electronic keypad locks to secure both the house and the garage. And, as explained by Steven, the code to enter the house was the same as the one used for entering the garage. As a result, at the time of the search, the officers believed that Leslie could access the garage. (Six years later, in her deposition testimony, Leslie denied ever knowing that the electronic key codes to the garage and the house were the same.)

The officers eventually decided to arrest Leslie and Steven. The next day, a state prosecutor charged Leslie with four crimes, including possession of processed marijuana with intent to deliver. Jordan signed the criminal complaint as the witness supporting the charges. The Isabella County District Court found probable cause and bound over Leslie to the county Circuit Court. The Circuit Court, however, eventually dismissed the charges, a decision the government did not appeal.

Leslie then filed this federal lawsuit against Jordan, Rice, and Trafelet alleging that her arrest violated federal and state law. Invoking qualified immunity in response to the federal claims—arrest and prosecution without probable cause, under 42 U.S.C. § 1983—and governmental immunity as to the state claims—false arrest, false imprisonment, and malicious prosecution—the officers moved for summary judgment. Concluding that the officers had probable cause to arrest Leslie, the district court awarded them summary judgment on all claims. Leslie timely appealed.

## II.

We review the district court's grant of summary judgment de novo. *Jordan v. Howard*, 987 F.3d 537, 542 (6th Cir. 2021). Summary judgment is appropriate if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). If the non-moving party cannot point to evidence demonstrating a material dispute of fact, summary judgment for the moving party is appropriate if the record and law could only support judgment in the moving party's favor. *Lemon v. Norfolk S. Ry. Co.*, 958 F.3d 417, 418–20 (6th Cir. 2020).

**A.** Begin with the question of whether qualified immunity shields the officers from Leslie's federal constitutional claims. Overcoming an assertion of qualified immunity requires Leslie to make a two-part showing. One, that defendants violated a federal constitutional right she enjoyed. Two, that the unlawfulness of defendants' conduct was clearly established when the violation occurred. *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018). As Leslie's arrest did not violate the Constitution, we can resolve today's case by focusing on the first inquiry alone. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Federal law governing arrests has deep roots, tracing back, in earnest, to the adoption of the Fourth Amendment. That Amendment familiarly protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. An arrest has long been considered a "seizure." *California v. Hodari D.*, 499 U.S. 621, 624–25 (1991). Taking the constitutional text at its word, then, if Leslie's arrest was "unreasonable," it ran afoul of the Amendment's command. *Wesby*, 583 U.S. at 56.

How do we go about determining if a warrantless arrest was reasonable? Precedent here is longstanding as well. In a sense, the court's job is straightforward: we evaluate whether there was probable cause to believe that the suspect committed a crime or was in the process of committing a crime. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). But that task is not always an easy one. For unlike more bright-line legal principles, probable cause is a "fluid concept," one that is "not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). At bottom, assessing probable cause depends on an evaluation of the

events leading up to the arrest.  From that pre-arrest backdrop, we ask whether an objectively reasonable officer would conclude that there is a "probability or substantial chance of criminal activity," thereby justifying an arrest.  *Wesby*, 583 U.S. at 57 (citation omitted).

In making that assessment, we operate with the understanding that "[p]robable cause is not a high bar."  *Id.* (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)).  It requires more than a reasonable suspicion but less than a preponderance of the evidence—and far less than guilt beyond a reasonable doubt.  *See United States v. McCallister*, 39 F.4th 368, 374 (6th Cir. 2022).  A "reasonable ground for belief of guilt" is sufficient.  *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citation omitted).  For example, an officer is under no obligation to give any credence to a suspect's story or forgo arrest pending further investigation if the initially discovered facts support probable cause.  *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988).  Nor do officers need proof conclusively showing that the suspect committed the crime. *Id.* at 262.  Likewise, a valid arrest "is not vitiated if the suspect is later found innocent."  *Id.*; *see also Manley v. Paramount's Kings Island*, 299 F. App'x 524, 530–531 (6th Cir. 2008) (per curiam) (noting that a state court's later decision to dismiss charges does not preclude a finding that the officers had probable cause to arrest).

Whether the officers had probable cause to arrest Leslie is a question of federal law.  But because the officers arrested her on suspicion of a state crime, we also consider Michigan law to understand the elements of that offense.  *See Leonard v. Robinson*, 477 F.3d 347, 354 (6th Cir. 2007).  All parties agree that the relevant crime in this case is possession of at least 5,000 grams of marijuana with the intent to distribute.  Mich. Comp. Laws § 333.7401(2)(d)(ii) (2016).  That being the case, today's inquiry is whether, after reviewing the facts leading up to Leslie's arrest in her favor, there was no fair probability that she had committed that crime.  Answering that question requires us to consider whether there was probable cause to infer possession of marijuana, as well as probable cause to infer an intent to distribute.  On balance, we agree with the district court that Leslie's arrest did not violate the Fourth Amendment.

**1.** Start with the question of whether it was unreasonable to suspect that Leslie likely possessed an illegal quantity of marijuana.  The answer, to our minds, is no.  In Michigan, possession may be actual or constructive.  Even if a defendant does not literally possess illegal

drugs, in other words, she can still be guilty of constructive possession if she knows that drugs are present and has the right to exercise control over them. *People v. Wolfe*, 489 N.W.2d 748, 753 (Mich. 1992); *People v. Williams*, 707 N.W.2d 624, 628 (Mich. Ct. App. 2005). Here, officers found a legally permissible amount of marijuana in Leslie's bedroom along with another 25 pounds in the Fishers' garage. And they were asked to believe that Leslie generally knew about her husband's grow operation yet had no idea of its scope nor ever entered the garage for two years as she slept just feet away.

Several facts created a "probability or substantial chance" that Leslie knew about the marijuana in the garage, had the right to exercise control over it, and therefore constructively possessed it. *Wesby*, 583 U.S. at 57 (citation omitted). First, Leslie admitted to using marijuana produced in the growing operation in the garage. "Common sense" indicates that someone possessing a small quantity of drugs also had access to the larger quantities of the drugs stored elsewhere in their residence. *See United States v. Jones*, 952 F.3d 153, 159 (4th Cir. 2020) (holding that officers had probable cause to suspect that a defendant possessed more than a single "smoldering marijuana joint" in a kitchen trash can). As Leslie admitted to using the marijuana found in the house, it would be reasonable to suspect that she had access to the larger quantities found in the garage. Second, as we have recognized under federal possession law, demonstrating that the defendant is the sole occupant of a residence is sufficient to convict her for constructive possession of contraband found there. *See United States v. Latimer*, 16 F.4th 222, 225 (6th Cir. 2021) (citing *United States v. Hill*, 142 F.3d 305, 312 (6th Cir. 1998)); *cf. People v. Hardiman*, 646 N.W.2d 158, 161, 166 (Mich. 2002) (holding that circumstantial evidence that the defendant resided in an apartment was sufficient to uphold a conviction for constructive possession). And when multiple individuals occupy a home, proof of residence combined with "an additional statement or circumstance to connect the defendant to [the] contraband" can sustain a conviction. *Latimer*, 16 F.4th at 225–26 (noting that the "quantum of [additional] evidence" is "minimal" (citation omitted)). Because probable cause requires "much less evidence [than is] sufficient to establish guilt beyond reasonable doubt," the mere fact that Leslie lived at and owned the site of the grow operation was likely enough to arrest her. *United States v. Strickland*, 144 F.3d 412, 416 (6th Cir. 1998); *see also People v. White*, No. 341939,

2019 WL 637306, at \*3 (Mich. Ct. App. Feb. 14, 2019) (holding that officers had probable cause to arrest a defendant upon finding marijuana in his home).

True, most of the drugs were found in the garage. But "[a] garage" like the one here "is part of a house." *United States v. Bell*, 766 F.3d 634, 637 (6th Cir. 2014); *cf. Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 600 (6th Cir. 1998) (concluding, in the context of the reach of the Fourth Amendment's reasonable expectation of privacy, that a home's detached garage is a part of the home itself). And the officers believed that Leslie knew the code needed to access her garage, as it was the same one needed to enter the house. Taking all of this together, the officers could reach the "common-sense conclusion[]" that Leslie knew about the activities in the garage and had the right to control the marijuana grown there. *Gates*, 462 U.S. at 231 (citation omitted).

On these issues, of course, we are not all of one mind. After its "[c]areful examination of the actual facts," the dissenting opinion concludes that Leslie never admitted to the officers that her marijuana use was tied to the growing operation in the family garage. *See* Dissenting Op. at 12–13. On this point, we are inclined to believe Leslie and her counsel, not the dissenting opinion: "Plaintiff [Leslie Fisher] admitted that she was aware Steve was growing some marijuana in the garage for their mutual medical needs." *See* Pl.'s Mot. Summ. J., R.60 PageID 542; *see also* Appellant Brief at 24 (conceding that Leslie admitted that her personal marijuana supply came from the garage).

What is more, additional facts indicated that Leslie knew the garage housed a grow operation created for more than legal, medical purposes. The house was filled with signs of drug trafficking. For example, officers found four long guns, two pistols, body armor, jewelry, almost $4,000 in cash, and the marijuana that Leslie admitted came from the garage. From this evidence, it is reasonable to conclude that Leslie was at least complicit in a "common enterprise" to illegally distribute drugs. *Pringle*, 540 U.S. at 373; *see United States v. Ramos*, No. 20-6158, 2021 WL 5647786, at \*3 (6th Cir. Dec. 1, 2021) (holding that it was "not clearly improbable" that the defendant possessed a firearm during drug trafficking after finding "drugs in the residence along with storage and packing materials, body armor, handguns, and an assault-type weapon").

Perhaps, as Leslie suggests, there was no direct evidence that she had entered the garage since the grow operation began. But probable cause does not require conclusive proof; it "does not require that [officers] possess evidence sufficient to establish a prima facie case at trial." *Strickland*, 144 F.3d at 416; *United States v. Torres-Ramos*, 536 F.3d 542, 555 (6th Cir. 2008). Rather, there must be enough evidence for the officers to have concluded that there was a "probability or substantial chance" that Leslie constructively possessed the illegal quantity of marijuana in the garage, a low bar the officers easily cleared. *Wesby*, 583 U.S. at 57; *see also Pringle*, 540 U.S. at 372 (holding that officers had probable cause to arrest an occupant of a car even in the absence of direct evidence indicating that he knew there was cocaine inside the vehicle).

Even then, says Leslie, no reasonable officer would have believed that she exercised control over the marijuana in the garage because she did not know the garage keycode. Here, the story is a bit nuanced. After the arresting officers arrived, Steven voluntarily gave them the code to the garage and told them that it was the same as the code to the house. And it is undisputed that Leslie knew the code to the house. Citing her deposition testimony, Leslie now claims that she told the officers that she did not know the identical garage code. But nothing in her deposition (taken six years after her arrest) leads us to believe that Leslie denied knowing the garage code on the day of her arrest. Regardless, even if Leslie did deny knowing the garage code on the day of her arrest, the officers were under no obligation to accept her explanation, especially when her story was not easy to believe. Holding that a suspect can defeat probable cause by asserting that she did not know she could access her own property feels akin to "allow[ing] every suspect, guilty or innocent, to avoid arrest simply by claiming 'it wasn't me.'" *Criss*, 867 F.2d at 263. The officers reasonably concluded there was a "probability" that Leslie possessed the marijuana in the garage. This is all that probable cause requires.

The dissenting opinion views the evidence differently, likely because it is using the wrong lens. By and large, the dissenting opinion conflates two long-settled legal standards: probable cause, the governing standard here, and proof beyond a reasonable doubt, the requisite benchmark for obtaining a criminal conviction. Citing several sufficiency of the evidence cases, the dissenting opinion concludes that the arresting officers fell short in connecting Leslie to the

illegal quantities of drugs in the garage. *See* Dissenting Op. at 11–13 (citing *United States v. Crumpton*, 824 F.3d 593 (6th Cir. 2016); *United States v. Bailey*, 553 F.3d 940 (6th Cir. 2009); *People v. Wolfe*, 489 N.W.2d 748 (Mich. 1992); *United States v. Walker*, 734 F.3d 451 (6th Cir. 2013)). To our eye, these cases address the evidence necessary to prove guilt beyond a reasonable doubt, not that needed to demonstrate probable cause, a much lower bar. *See Strickland*, 144 F.3d at 416; *Wesby*, 583 U.S. at 57. Again, probable cause demands even less than that necessary to establish a prima facie case at trial, *see Torres-Ramos*, 536 F.3d at 555, let alone to convict. The evidence may not have been enough to convict Leslie of drug crimes, seemingly why the charges ultimately were dismissed. But the question here relates only to probable cause, a standard that was easily met.

**2.** Because there was probable cause to believe Leslie possessed the marijuana in the garage, it follows that the officers had probable cause to suspect her intent to distribute. Under Michigan's Medical Marihuana Act, Mich. Comp. Laws § 333.26424(a) (2016), the Fishers collectively could legally possess 24 plants and five ounces of marijuana. They well exceeded those limits. Inside the garage, officers recovered 67 marijuana plants and about 400 ounces (25 pounds) of marijuana. Any reasonable officer would suspect that an individual possessing such a large quantity of illegal drugs intended to sell them. *See United States v. Sadler*, 24 F.4th 515, 550–51 (6th Cir. 2022), *cert. denied sub nom. Tempo v. United States*, 143 S. Ct. 169 (2022) (noting that intent to deliver illegal drugs can be inferred from their quantity and packaging); *United States v. Williams*, 473 F. App'x 481, 486 (6th Cir. 2012) (same, applying Michigan law).

Leslie's primary refrain is to argue again that there was no evidence indicating she was aware of the quantity of marijuana in the garage. But, as discussed, it was reasonable for the officers to suspect that she knew as much, and thereby constructively possessed the contraband. From there, they could also reasonably infer her intent to distribute.

Next, Leslie contends that there are genuine disputes of material fact that preclude granting summary judgment in favor of defendants. First, she argues that it is disputed whether Steven admitted to the officers that he attempted to sell marijuana. But this factual point is immaterial to the question of probable cause. The sheer quantity of marijuana in the Fishers' garage supported probable cause to infer intent to distribute. Based on this undisputed fact

alone, the officers had probable cause to arrest.  So too for Leslie's contention that whether she possessed THC wax in her upstairs bedroom is a disputed fact.  Citing Leslie's own deposition testimony, the district court noted that she admitted to having THC wax inside her house.  In the end, the specific location of the wax, bedroom or otherwise, is immaterial to the question of whether the officers had probable cause.

**B.**    The district court also concluded that defendants were entitled to governmental immunity from Leslie's state law claims.  Governmental immunity, an affirmative defense under Michigan law, shares some similarities with the federal qualified immunity doctrine.  Like the relationship between qualified immunity and federal constitutional claims, Michigan's governmental immunity doctrine shields government employees from certain forms of state tort liability.  *Peterson v. Heymes*, 931 F.3d 546, 557 (6th Cir. 2019).  Although governmental immunity differs in some respects from qualified immunity, probable cause is dispositive under both paradigms.  *See Odom v. Wayne County*, 760 N.W.2d 217, 228–29 (Mich. 2008) (holding that an officer is entitled to governmental immunity from false arrest and false imprisonment suits if he had probable cause).

Decisive here, then, is the fact that the probable cause analysis for federal Fourth Amendment claims "is essentially the same under Michigan law." *Hinchman v. Moore*, 312 F.3d 198, 204 (6th Cir. 2002) ("Probable cause to arrest exists where the facts and circumstances within an officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." (quoting *People v. Champion*, 549 N.W.2d 849, 860 (Mich. 1996))).  As already explained, the officers had probable cause to suspect that Leslie possessed an illegal quantity of marijuana with the intent to distribute.  Accordingly, the officers are entitled to governmental immunity from Leslie's state law claims.

We affirm.

_____

**DISSENT**

_____

KAREN NELSON MOORE, Circuit Judge, dissenting.  In holding that the police officers had probable cause to arrest Leslie Fisher ("Fisher"), the majority today fails to establish that a sufficient nexus existed between Fisher herself and the contraband that the police found in the detached garage.  Fisher co-owed with her husband, Steven Fisher ("Steven"), the residential property where the garage was located.  R. 64-7 (Search Warrant Aff. at 3) (Page ID #961).  Steven admitted to the police on the day that they arrested the couple that he was the one running the marijuana grow operation in the garage, and that Fisher "did not know the extent of his marijuana grow operation."  R. 61-5 (MSP Supplemental Incident Rep. 2 at 5) (Page ID #711).  When multiple individuals jointly own a property, like the Fishers do with the house and detached garage here, our precedent requires a showing of "'other incriminating statements or circumstances tending to buttress'" an inference of each co-owner's constructive possession of contraband found on the premises.  *United States v. Crumpton*, 824 F.3d 593, 609 (6th Cir. 2016) (quoting *United States v. Bailey*, 553 F.3d 940, 944 n.3 (6th Cir. 2009)).  Michigan law similarly dictates that to prove possession, there must be "'a sufficient nexus between the defendant and the contraband,' including whether 'the defendant exercised a dominion and control over the substance.'"  *People v. Bylsma*, 825 N.W.2d 543, 550–51 (Mich. 2012) (quoting *People v. Wolfe*, 489 N.W.2d 748, 754 (Mich. 1992)).  In Fisher's case, no such nexus exists.  Because I would hold that the officers did not have probable cause to arrest Fisher for constructive possession, I would reverse the district court's grant of summary judgment.  I respectfully dissent.

When evaluating whether an arrest for violating state law was authorized, we look "in the first instance [to] state law" for the elements of an offense before determining whether an officer had constitutionally adequate probable cause.  *See Logsdon v. Hains*, 492 F.3d 334, 341–43 (6th Cir. 2007) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)).  Both our and Michigan's caselaw routinely requires, in cases of joint possession or ownership of property, that additional evidence must show that a nexus exists between each of the co-owners and any contraband found on that property.  *See Bailey*, 553 F.3d at 948; *Crumpton*, 824 F.3d at 609; *Wolfe*, 489 N.W.2d at

753–54. In affirming the district court's grant of the defendants' motion for summary judgment, the majority states that sufficient "minimal" additional evidence supported the officers' conclusion that Fisher constructively possessed the marijuana grow operation. Maj. Op. at 6. The majority relies on the following purported facts to hold that the officers had probable cause to arrest Fisher: (1) the "mere fact that [Fisher] lived at and owned the site of the grow operation"; (2) Fisher's admission that she used marijuana; (3) the presence of "four long guns, two pistols, body armor, jewelry, almost $4,000 in cash, and the marijuana that [Fisher] admitted came from the garage"; and (4) the fact that Fisher knew the house code, which Steven told them was the same as the garage code. *Id.* at 6–8. Careful examination of the actual facts here reveals the absence of the requisite nexus between Fisher and the marijuana grow operation in the garage that would give rise to a reasonable belief of constructive possession under Michigan and federal law.

The majority claims, in a troubling departure from precedent, that the "mere fact" that Fisher "lived at the site of the grow operation was likely enough to arrest her." *Id.* at 6–7. This directly contravenes our and Michigan's precedent requiring additional evidence to show a nexus between each co-owner and any contraband on the premises. *See Bailey*, 553 F.3d at 948; *Crumpton*, 824 F.3d at 609; *Wolfe*, 489 N.W.2d at 753–54. Even though this additional evidence can be "minimal," it *must* exist. *See United States v. Walker*, 734 F.3d 451, 456–57 (6th Cir. 2013). The officers could not rely on the "mere fact" that Fisher lived at and co-owned the house where a grow operation existed in the detached garage as sufficient to establish that they had probable cause to arrest her.

The majority states that because the beyond-a-reasonable-doubt standard poses a higher bar than does the probable-cause standard (which I agree is the relevant standard here), the cases cited above are inapplicable to Fisher's arrest. Maj. Op. at 8–9. However, the principle that these cases articulate, that a co-owner of a property cannot be considered to constructively possess contraband found on the premises by virtue of their status of co-owner alone, logically applies to probable cause as well. Even when we are applying the lower probable-cause standard, an officer's "belief of guilt must be particularized with respect to the person to be . . . seized." *United States v. Romero*, 452 F.3d 610, 616 (6th Cir. 2006) (quoting *Maryland v.*

*Pringle*, 540 U.S. 366, 371 (2003)). It stands to reason that officers must have more than mere knowledge that an individual has nonexclusive control over a property before they conclude that sufficient evidence exists to establish probable cause. The majority also fails to point to anywhere in our caselaw that explicitly states that co-ownership of a premises suffices to establish probable cause. Instead, the majority simply concludes that, because the standard for probable cause is lower than that for beyond a reasonable doubt, the principle that additional evidence beyond property ownership is required to demonstrate constructive possession in the case of co-owners does not apply to probable cause cases. I would hold otherwise.

Likewise, Fisher's admission that she used marijuana cannot be used to indicate that she "also had access to the larger quantities of the drugs stored elsewhere in [the] residence," as the majority claims. Maj. Op. at 6. The single out-of-circuit case that the majority cites for this premise, *United States v. Jones*, 952 F.3d 153 (4th Cir. 2020), was decided against the backdrop of a different legal framework, in which the "possession of marijuana [was] a crime in Virginia," *id.* at 155. Here, in contrast, Fisher legally held a Michigan Medical Marijuana Card which, as she explained to the officers at her home, allowed her to possess 2.5 ounces of marijuana. R. 61-5 (MSP Supplemental Incident Rep. 2 at 4–5) (Page ID #710–11). In the house itself, the police found only 29.9 grams (or roughly 1.05 ounces) of marijuana, which is well below Fisher's legally permitted amount. *Id.* at 6 (Page ID #712). The majority states that Fisher told the officers on the day of her arrest that the marijuana she used was grown in the garage, but this is not reflected anywhere in the contemporaneous record. *See id.* at 5 (Page ID #711) (describing the interview with Fisher, in which she told the officers that she used marijuana and had a medical marijuana card, but she never explicitly stated that Steven grew the marijuana that she used). The majority instead relies on the fact that Fisher has conceded that the marijuana she smoked came from the garage in her Motion for Summary Judgment and her Appellant Brief. Maj. Op. at 7. These statements do not shed any additional light on what the officers knew *at the time of Fisher's arrest*, which is the relevant inquiry when addressing probable cause. *See Sykes v. Anderson*, 625 F.3d 294, 306 (6th Cir. 2010). Even if Fisher had told the officers that Steven had grown her marijuana, however, her possessing and using a legally permissible amount of marijuana still cannot be used to demonstrate that she had access to, or knew about, the illegal marijuana grow operation that was not located in the main residence she occupied.

The majority states that the officers could reasonably use their recovery of weapons and other valuables found inside the Fishers' house "to conclude that Leslie was at least complicit in a 'common enterprise' to illegally distribute drugs." Maj. Op. at 7. In addition to the marijuana overages and paraphernalia found in and seized from the detached garage, the officers uncovered from the house six firearms (four long guns and two hand guns), body armor, jewelry (four pieces appraised at a total of $3,850), and $3,915 in cash. R. 61-5 (MSP Supplemental Incident Rep. at 1, 3) (Page ID #707, 709). Given the fact that this address served as the Fishers' main residence, though, the officers should not have been particularly surprised to find cash and a few pieces of jewelry in the house. Five of the six firearms were found on the main floor of the residence where Steven was located, but only one firearm was recovered in the upstairs bedroom nightstand where Leslie was found. *Id.* at 2–3 (Page ID #708–09). In contrast, all of the drug paraphernalia (grow lights, drying racks, etc.) that the officers found was located in the detached garage. *Id.* at 1, 3 (Page ID #707, 709).

The majority's use of the presumption that the presence of guns, body armor, jewelry, and cash in the main house sufficiently supports the conclusion that Fisher was "at least complicit," Maj. Op. at 7, in drug trafficking leads it to skip a critical step in its reasoning. The majority ignores the fact that there is no indication of a connection between Fisher and the drug paraphernalia in the garage, and collapses into circular reasoning: First, the majority appears to presume that Fisher knew about the paraphernalia in the detached garage and relies on the proximity of this paraphernalia to the firearms in the house to state that it would be "reasonable to conclude that" Fisher was at least complicit in a drug-distribution scheme, based on the weapons and valuables in the house. Maj. Op. at 7–8. Second, the majority relies on this unfounded presumption as a factor to establish that officers could reasonably believe that Fisher knew about Steven's activities in the detached garage, including the paraphernalia he kept there. *Id.* Absent any independent indication that Fisher knew either about the garage paraphernalia or that the firearms were otherwise involved in drug activity, the majority's line of reasoning constitutes a circular fallacy. It cannot serve as the requisite additional evidence to show that the officers reasonably believed Fisher constructively possessed the marijuana grow operation in the detached garage.

To support the notion that reasonable officers could have believed Fisher had access to the garage, the district court below and the majority now also cite the fact that the codes to access the garage and the house were the same on the day that the police arrested Fisher. However, the contemporaneous record does not show that Steven told the officers what each of the codes was. *See* R. 61-5 (MSP Supplemental Incident Rep. 2 at 3–5) (Page ID #709–11) (describing the officers' interview with Steven, which does not include any mention of the house and/or garage codes). The majority relies on the officers' deposition testimony (taken about five years after the arrest) stating that "Steven voluntarily gave them the code to the garage and told them that it was the same as the code to the house." Maj. Op. at 8; *see also* R. 61-10 (Rice Dep. Aug. 25, 2021 at 103) (Page ID #796); R. 61-11 (Jordan Dep. Sept. 13, 2021 at 115) (Page ID #818). This deposition testimony does not tell us that, at the time of Fisher's arrest, the officers knew that the codes were the same. What the contemporaneous record does tell us, though, is that Fisher told the officers "that she does not go into the garage," R. 61-5 (MSP Supplemental Incident Rep. 2 at 5) (Page ID #711), and that Steven said that "his wife Leslie did not know the extent of his marijuana grow operation because she seldomly went into his garage," *id.* The officers seemingly presumed that, because Fisher could access the house, she could also access the garage.

Considering what the record establishes the police officers knew at the time they made the decision to arrest Fisher, I would hold that the officers did not have sufficient evidence to establish a nexus between Fisher and the marijuana and paraphernalia found in the garage, and thus lacked probable cause to believe that Fisher constructively possessed the products of Steven's illegal grow operation. Fisher was legally permitted to possess the amount of marijuana that the officers found in the house. The officers could not rely on their finding this small quantity to conclude that Fisher had access to a larger amount of drugs located outside of the house. The "mere fact" that she jointly owned the property that included her house and the detached garage, the latter of which was the site of the marijuana grow operation, cannot be sufficient under our precedent to permit officers to determine that Fisher "likely" constructively possessed the marijuana in the garage grow operation. Without more evidence indicating that it would be reasonable for an officer to conclude that Fisher knew about the grow operation in the detached garage, the presence in the house of body armor, guns, jewelry, and cash does not

support a finding of probable cause for Fisher's arrest. Because there is an insufficient nexus, based on the records contemporaneous with Fisher's arrest, to connect her to the contraband found in the detached garage, I would reverse the district court's grant of summary judgment. I respectfully dissent.